# Walter Ascher
225 E. Irving Park Road
Roselle, IL 60172
Email ascher1@sbcglobal.net
Phone: (630)307-1106    Fax: (630)307-3797

| | Real Estate | Accounting | Available Properties |

## *Walter Ascher, J.D., LLM*



- Juris Doctor & Master of Tax Law Degrees
- Passed the Illinois Bar
- Enrolled to practice Internal Revenue Service
- Licensed Real Estate Broker
- Senior Appraiser
- Certified Financial Planner
- College Business Course Instructor
- Real Estate Developer and Investor
- Franchise Development



**Own and Manage:**

- Shopping Centers
- Office Buildings
- New Construction
- Apartment Complexes
- Condo Conversions
- Triple Net Investments
- Industrial Property

## Completed & Current Projects

- Bought, converted and sold 228 apartment unit complex in 6 month period ($28,000,000 Project)
- Bought and converted 8 unit (54,000 sq. ft) industrial unit into industrial condos.
- Sold and bought triple net gas stations
- Constructed new homes
- Sold shopping center/office buildings
- Formed Truck Financial Corp - 8% return opportunity for investors
- Purchased 240 unit apartment complex to be converted to condominiums



($36,000,000)
- Started pizza franchise – expect to sell 500 units world wide
- Bought shopping center
- Obtained franchise for selling Chinese Motor vehicles in local area
- New home construction
- Bought & sold businesses

Designed by StuffNearby.com

# DISTRIBUTORSHIP AGREEMENT

THIS DISTRIBUTORSHIP AGREEMENT (this "Agreement") is made effective as of the 2nd day of March, 2007, by and between GZ Gourmet Food and Beverage, Inc.(the "Company"), a California C Corporation, having its principal place of business located at 15500 Erwin Street Suite 1033, Van Nuys, California 91411, and Walter Ascher, an Illinois resident (or his controlled entity) ("Distributor").

## RECITALS

A.     The Company is in the business of creating, manufacturing, marketing and distributing beverages including the sports energy drink known as "Radioactive" (the "Products"), and, subject to the provisions of this Agreement, desires to sell the Product exclusively to Distributor within the Territory.

B.     Distributor markets, distributes and sells products of the type sold by the Company, and desires to buy the Products from the Company; and

C.     The Company and Distributor desire to enter into this Agreement authorizing Distributor to market, distribute and sell the Products in the Territory upon the terms and provisions stated herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS.

1.1.    Products. The term "Products" means the products identified in Part One of Exhibit A to this Agreement (as amended from time to time to reflect any additional products included in the Company's product line). The parties acknowledge that the Products, given their general characteristics, purpose, and usage, belong to a single range of goods commonly known as "energy drinks."

1.2.    Confidential Information. The term "Confidential Information" shall mean any information developed, owned or controlled by the Company that the Company treats or maintains as confidential, proprietary, restricted or otherwise as not to be disclosed generally (including without limitation, this Agreement and information and knowledge that pertain to the Products). Confidential Information, however, shall not include: (i) information in the public domain at the time of disclosure; (ii) information published after disclosure (unless such publication is a breach of this Agreement), (iii) information shown to have already been in



Distributor's possession prior to disclosure by the Company, and (iv) information disclosed by a third party, as a matter of right, without restrictions on disclosure and use.

1.3    Trademarks. The term "Trademarks" shall mean the names "Radioactive", "Catch the Glow" and any other trademark, service mark or other commercial designation, whether or not registered, used to represent or describe the products or services of the Company, including the Products, and shall include those trade names, trademarks, service marks, trademark or service mark registrations, and pending applications for such registrations, registered or filed in the United States or countries or jurisdictions foreign thereto, which are or may hereafter be owned by the Company.

## ARTICLE II.
## APPOINTMENT OF DISTRIBUTOR; RELATIONSHIP BETWEEN PARTIES

2.1.    Grant of Distribution Rights. Subject to the provisions hereof, including, without limitation, Exhibit A hereto, and in consideration of the payment to the Company of $592,600 by cashier's check or wire transfer to the Company to be delivered from an independent escrow upon the execution hereof, the Company hereby grants to Distributor the right to purchase Products from the Company for resale in the Territory, and Distributor agrees to only purchase the Products from the Company, for the term and in accordance with the provisions of this Agreement. Distributor shall not solicit orders for the Products outside the Territory nor maintain any distribution depot or warehouse for the Products outside the Territory.

2.2    Exclusive Nature of Grant - Company. Except as provided in Article VI of this Agreement, the Company undertakes not directly or indirectly, during the term of this Agreement, to sell the Products in or for delivery to the Territory or to appoint any person other than Distributor as Distributor of the Products within the Territory without the prior written consent of the Distributor.

2.3    Exclusive Nature of Grant - Distributor. Distributor undertakes and agrees that, during the term of this Agreement, it shall not purchase or distribute any other product within the energy drink market other than the Products without the prior written consent of the Distributor.

2.4    Relationship Between the Parties. The relationship between the Company and Distributor under this Agreement is that of vendor and vendee. Neither Distributor nor its officers, employees or agents are or will be deemed to be the agents or representatives, legal or otherwise of the Company for any purpose whatsoever. Neither Distributor nor its officers, employees or agents are granted by this Agreement or otherwise any express or implied right or authority (neither shall Distributor or its officers, employees or agents take any action which would have the effect of creating the appearance of such authority) to assume or create any obligation or responsibility on behalf of or in the name of the Company, or to bind the Company in any manner whatsoever. Distributor, its officers, employees and agents shall not act or purport to act as agents or representatives of the Company when (a) selling Products under the terms of

2

this Agreement, (b) executing contracts with customers for sale of Products, (c) dealing with employees or third parties or (d) undertaking any other activity, related or unrelated to this Agreement.

### ARTICLE III.
### UNDERTAKINGS OF THE COMPANY.

3.1.    Product Liability Insurance. Maintain product liability insurance in the product in an amount not less than One Million dollars ($1,000,000) and will provide Distributor with a Certificate of Insurance evidencing such coverage which shall not be cancelable with less than thirty (30) days advance notice.

3.2    Condition of Products. Deliver to Distributor only product that is fit and sufficient for the purposes intended, merchantable, of good quality, free of defect including packaging and conforming to all applicable health and safety laws established by federal, state, municipal or other entities with appropriate jurisdiction.

3.3    Standard of Performance. the Company agrees to use commercially reasonable efforts in performing its obligations under this Agreement.

3.4    Products Warranty.

3.4.1    The Company warrants to Distributor that, within a Product's stated shelf life, such Products shall be free from defects in materials. Distributor's remedy with respect to any breach of this Products warranty shall be limited to the prompt replacement of such item at the Company's expense. THE FOREGOING PRODUCT WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, CONDITIONS, TERMS AND/OR UNDERTAKINGS, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WHETHER IMPOSED BY CONTRACT, STATUTE, COURSE OF DEALING, CUSTOM OR USAGE OR OTHERWISE, AND ALL SUCH WARRANTIES, CONDITIONS, TERMS AND/OR UNDERTAKINGS ARE HEREBY EXCLUDED. THE REMEDIES UNDER THIS WARRANTY ARE EXCLUSIVE AND THE COMPANY NEITHER ASSUMES NOR AUTHORIZES ANYONE TO ASSUME FOR IT ANY OTHER OBLIGATION.

3.4.2    EXCEPT AS SPECIFIED IN THIS 3.4, THE COMPANY SHALL NOT BE LIABLE TO DISTRIBUTOR FOR ANY LOSS OR DAMAGE, WHETHER ARISING FROM NEGLIGENCE, BREACH OF CONTRACT OR ANY OTHER CAUSE OF ACTION, THAT MAY ARISE IN CONNECTION WITH THE USE OR PERFORMANCE OF THE PRODUCTS, IN EXCESS OF THE AMOUNT PAID THEREFOR BY SUCH PARTY, AND IN NO EVENT SHALL THE COMPANY SUFFER ANY LIABILITY FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, EVEN IF THE COMPANY HAS BEEN ADVISED OF THE POSSIBILITY THEREOF, AND WHETHER ARISING FROM

3

NEGLIGENCE OR FROM ANY OTHER CAUSE WHATSOEVER.

           3.4.3  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED BY APPLICABLE LAW, THE ABOVE WARRANTY SHALL CONSTITUTE THE SOLE REMEDY OF DISTRIBUTOR AND THE SOLE LIABILITY OF THE COMPANY UNDER ANY LEGAL THEORY OR THEORIES WHATSOEVER. DISTRIBUTOR WAIVES ALL OTHER REMEDIES, WARRANTIES, GUARANTEES, CAUSES OF ACTION OR CLAIMS, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE AGAINST THE COMPANY.

## ARTICLE IV.
### UNDERTAKINGS OF DISTRIBUTOR

In addition to its other duties specified herein, Distributor agrees to do the following:

        4.1    DISTRIBUTOR MARKETING AND SALES: Distributor agrees:

           4.1.1  To use its best efforts to merchandise, promote, advertise, develop and maintain the sales and distribution of Products in the Territory throughout all distributor channels or outlets available for the sale and marketing of Products to consumers within the Territory and make its best efforts to effect the expansion of such sales and distribution throughout the term of this Agreement and any renewal thereof. Company and Distributor shall, on a continuing basis, establish specific sales goals for Product, including but not limited to, those listed in Schedule "A" attached hereto and incorporated by reference herein.

           4.1.2  To distribute in reasonable, economically and advantageous manner, all point of sale advertising material, pursuant to the terms of the promotional and advertising cooperative programs as established between the parties throughout the term of this Agreement in advantageous locations throughout the Territory and inside and outside all places of business in which Product is on sale insofar as is possible, permissible and affordable; all of which are intended to increase sales of the product within the Territory.

           4.1.3  To maintain at all times a qualified selling staff. Although, Distributor may not assign its obligations under this Agreement, the Distributor shall have the authority, subject to the provisions of the Agreement, to appoint dealers and/or sub-distributors in the Territory for the sale and promotion of Product covered by this Agreement provided such dealers meet the reasonable minimum requirements established by the Company and provided that the prospective dealers and/or distributors are approved in writing by the Company prior to appointment by the Distributor. If Distributor uses the services of independent contractors or sub-distributors or sub-licensees in its distribution arrangements in the furtherance of its obligations under this Agreement to service the Territory, Distributor shall be responsible for the conduct of any of its sub-distributors or sub-licensees. Any agreement between the Distributor and a dealer and/or distributor must be approved in form and substance by the Company and must provide that the dealer and/or distributor appointed by the Distributor shall not take any action or fail to take any action contrary to the terms of this Agreement. In all such agreements the Distributor is acting as principal in its own behalf, not as agent for the Company. In the event

4

this Agreement is terminated, any and all sub-distributor agreements shall be automatically terminated and Distributor agrees to indemnify and hold harmless Company from any and all claims asserted by any of the Distributor's sub-distributors including all attorney's fees and other expenses and costs incidental thereto. The Distributor agrees to furnish all contact information for any dealers and/or distributors that it has appointed. Distributor shall provide to each of its sub-distributors, adequate supervision and support to promote the Products, including but not limited to providing information regarding new products, promotional program participation, periodic sales meetings and point of sale materials. The Company retains the right to continue utilizing the services of these dealers and distributors upon termination of this Agreement, however, the Company agrees to not sell directly to said dealers and/or distributors during the term of this Agreement.

4.1.4    To effect and maintain the distribution of the Products by the use of beverage trucks and standard body design, sufficient in number to adequately serve the Territory covered in this Agreement in good operating order, condition, repair and appearance.

4.1.5    To maintain within the Territory an inventory of Product described in paragraph 1 and set forth in Schedule "A" at all times adequate to satisfy demand for the Product within the Territory.

4.1.6    Distributor shall only sell the Product in the Territory and shall not sell Product for shipment out of the Territory or to any person or entity who Distributor knows or has reason to know may sell or distribute Product outside the Territory.

4.1.7    Distributor shall, on a monthly basis, provide Company with complete sales data for the prior month. Such data shall be received by Company by the 5th day of the succeeding month for which the data is applicable. More detailed information as to market penetration, levels of distribution (SKUs) by channel, number of established accounts, results of promotion programs, total account base and other data or information, as the Company may reasonably request concerning Distributor's sales of the Products, shall be provided to the Company, only upon request, within fifteen (15) days of receipt of said request by the Distributor from the Company. Distributor shall allow the Company's representatives to work the sales routes with the Distributor's salesperson.

4.1.8    To pay all costs associated with any sub-distributors and/or the placement of Products, including, with our limitation all shelving fees, rebates or other product programs or expenses, imposed in connection with Distributor's sale of the Products which are not explicitly agreed to by Company, in writing. Distributor further agrees to indemnify and hold the Company harmless against any such liabilities.

4.2    Taxes, Levies, Etc. To pay, collect and remit all value-added, sales, use, and other taxes and charges, including, without limitation, landing fees, import duties, border taxes, brokerage fees, and other import charges or expenses, imposed in connection with Distributor's sale of the Products (other than income taxes of the Company resulting from such sales). Distributor further agrees to indemnify and hold the Company harmless against any such

5

liabilities.

4.3. Standard of Performance. Distributor agrees to use commercially reasonable efforts to perform each of the duties described in 4.1 and 4.2 hereof in a manner that preserves and protects the Company's business reputation and its proprietary rights in the Products. Distributor warrants that it is legally qualified in the Territory to market and license the Products as contemplated by this Agreement.

## ARTICLE V
## PRODUCT ORDERS

5.1 Purchase Orders. During the terms of this Agreement, Distributor agrees to purchase from Company such minimum quantities of Product as set forth on Exhibit A, Part Four attached hereto. Distributor shall provide the Company with purchase orders from time to time specifying the type and amount of the Products it wishes to acquire. All such sales shall be made pursuant to orders made by the Distributor that are accepted by the Company at its offices, and the terms and conditions of such sales shall be those set forth in the Acknowledgement of Order form on which such acceptance is recorded.

5.2 Shipping and Delivery. Distributor agrees to pay all direct costs of shipping the Products to Distributor's place of business or other shipping point directed by Distributor. The Company shall not bear any liability resulting from any delay in the delivery of Products to Distributor. Risk of loss of or damage to the Products shall pass to Distributor when such Products leave the Company's shipping point.

5.3 No Warranty of Timely Availability. Except as otherwise provided herein, the Company does not represent or guarantee to Distributor hereunder the continued timely availability for sale of any of the Products and assumes no liability in connection with any loss or damage to Distributor arising out of the Company's failure to accept or fill orders for the Products on a timely basis; provided however, that the Company will at all times use its "best efforts" to provide Products on a timely basis within thirty (30) days of the agreed upon delivery date. The availability of Products shall also be subject to events of Force Majeure (as defined in Section 13.10 hereof) beyond the control of the Company, or any other cause beyond the parties' control. The Company, in its sole discretion, may at any time, with thirty (30) days prior notice to Distributor change any Products, withdraw any Products from its current list of Products, or limit available quantities of any Products. Extraordinary delays in availability of Products, including Force Majeure events, shall suspend or toll the term of this Agreement under Section 11.1 hereof.

### 5.4 Alternative Production

Notwithstanding the foregoing, if at any time after the Initial Period, Distributor is repeatedly, and without reasonable excuse but including Force Majeure, late (as defined below) in the performance of the delivery of Product to Distributor as ordered, then in such case, Distributor shall have the right to arrange for alternative production of Product at other facilities

6

selected by it for the purpose of meeting its contractual obligations for the delivery of Product. Distributor shall promptly cease utilizing such alternative facilities at such time as the Company has demonstrated to the reasonable satisfaction of Distributor that it has made the necessary arrangements to allow it to continue providing Product to Distributor in compliance with the terms hereof.

For purposes of this Agreement, the term "late" as used herein shall mean the failure to deliver Product within ten (10) business days of the due date thereof (an "Event of Default") three (3) times or more in any consecutive four (4) month period or five (5) times or more in any twelve (12) months period. Failure to deliver at least seventy five percent (75%) of any order for Product in excess of 2000 cases shall be deemed to be an Event of Default irrespective of the actual delivery date of such order.

Distributor shall provide written notice to the Company of any failure to deliver on a timely basis and if the Company is able to deliver Product as requested by Distributor within forty eight (48) hours of receipt of such notice then such untimely delivery shall have deemed to be been cured for purpose of this Agreement and shall not be considered an Event of Default.

## ARTICLE VI
### CERTAIN SALES BY THE COMPANY

6.1    Sales Rights Retained By Company. It is understood that the Company reserves the right to sell the Products directly in the Territory:

6.1.1    to any manufacturer for developing, testing or fabricating programs;

6.1.2    to any organization for the purposes of mass distribution to the major retail stores and/or companies which are excepted from the Territory as defined on Exhibit A, Part Two attached hereto.

## ARTICLE VII
### PRICE AND PAYMENT

7.1    Product Price. During the term of this Agreement, Distributor agrees to purchase from Company such minimum quantities of Product as set forth on Exhibit A, part Four attached hereto. The selling price to the Distributor shall be the lowest wholesale price prevailing from time to time to any major retail distributor of the Company, including, for example, CVS Pharmacy, Kroger's, Target, etc. During the first ninety (90) days of this Agreement (the "Initial Period"), the selling price to the Distributor for each Product shall be less than the prevailing wholesale price as an incentive to the Distributor. The selling price during the Initial Period shall be as set forth on Exhibit A, part Three attached hereto. Following the initial term of this Agreement, and, subject to the terms hereof, the selling price to the Distributor for each Product is subject to change by the Company from time to time upon not less than thirty (30) days prior

7

written notice to Distributor.

7.2     Payment Terms. Payment shall be made via wire transfer, company check or credit card prior to shipping Product. Credit terms may be negotiated after a period of 90 days, and no credit will be provided for any order that is larger than any previous order which was prepaid. All International orders must be prepaid.

7.3     Credits, Rebates and Programs. Unless otherwise expressly agreed to by Company in writing, Distributor shall receive no marketing and advertising credit against the per case purchase price or any other sales rebates or program of any kind.

7.4     No Right of Return. Distributor shall have no right to return any Product or receive any refund for Product purchased except as provided in Section 3.4 of this Agreement.

## ARTICLE VIII
## TRADE SECRETS AND PROPRIETARY INFORMATION

8.1.     Proprietary Nature of Products. Distributor acknowledges that the Products are proprietary in nature, that the Company claims all trade secrets, copyright, trademark and patent rights granted by law therein, and that the Company neither grants nor otherwise transfers any rights of ownership therein to Distributor or any end user.

8.2.     No Products Modifications. Distributor agrees not to modify or alter, or attempt to modify or alter, the Products.

8.3.     Remedies. In the event of a breach by Distributor or any of its officers, employees or agents of its or their obligations under this Article 8, the Company may immediately terminate this Agreement without liability to the Company, may bring an appropriate legal action to enjoin any such breach hereof, and shall be entitled to recover from Distributor reasonable legal fees and costs in addition to other appropriate relief.

8.4.     Confidential Information. Distributor agrees that it will use all Confidential Information disclosed to it by the Company only in furtherance of its performance hereunder, and for no other purpose. Except as provided above, Distributor agrees that it will not disclose Confidential Information to any other person or entity without the express prior written consent of the Company. Distributor agrees that it will protect the confidentiality of Confidential Information with the same degree of care with which it protects its own confidential information. The foregoing confidentiality obligations shall survive termination of this Agreement. All Confidential Information furnished to Distributor hereunder (including all copies thereof) is and shall remain the property of the Company and shall be returned to or otherwise disposed of as instructed by the Company promptly upon demand or upon the termination of this Agreement.

8

## ARTICLE IX
## USE OF TRADE NAMES AND TRADEMARKS

9.1.    Scope of Use.

(a)    Distributor hereby acknowledges the validity and the Company's ownership of the Company's Trademarks throughout the world, whether or not registered. Distributor further acknowledges that, except as provided herein or as otherwise expressly provided in writing, (i) it has no rights or interest of any kind in or to the Company's Trademarks, (ii) it shall acquire no rights or interest therein by virtue of this Agreement or the performance by Distributor of its duties and obligations hereunder, and (iii) it will not assert any rights or interests therein by virtue of the rights granted to Distributor hereunder.

(b)    The Company hereby grants to Distributor during the term of this Agreement the non-exclusive, limited right to use the proprietary Products names and Trade marks in marketing the Products in the Territory pursuant to this Agreement. All rights arising from such use by Distributor shall inure to the Company. The Company makes no warranty, express or implied, as to the use or validity of such Trade marks.

(c)    Distributor shall identify the owner of the Trademarks as designated by the Company in all Products advertising. the Company reserves the right to approve all advertising and marketing materials of Distributor to ensure the proper use of the Trademarks. Distributor's rights hereunder shall continue only during the term of this Agreement and, upon termination of this Agreement, Distributor shall cease to use such Product names or and marks or variants sounding like or appearing to be similar thereto.

(d)    Distributor shall not remove, alter or obliterate, or cause to be removed, altered or obliterated, any trademarks, trade names or other symbols placed upon Products delivered to Distributor; provided, however, that Distributor may apply its own name and address to the packaging of the Products.

9.2    Registration of Trademarks. Unless prior registration of any Trademark is required by the laws of the Territory as a prerequisite for importation of the Products, the Company reserves the right to decide whether and when to apply for the registration of the Trademarks in the Territory. Any trademark registration shall be in the name and for the benefit and the account of the Company.

## ARTICLE X
## COMPETITION

The parties acknowledge that Distributor will acquire much knowledge and information concerning the Company's business as the result of this Agreement. The parties further acknowledge that the business in which the Company is engaged is very competitive, and that competition by Distributor in that business would injure the Company. Consequently, in addition to those requirements under section 8.4 and Article IX above, Distributor agrees that for

9

the term of this Agreement, neither Distributor nor or any agents or representatives under its control, shall, directly or indirectly, sell, distribute or otherwise become involved with any products that are the same as or similar to the Products.

<div align="center">

ARTICLE XI

TERM AND TERMINATION

</div>

11.1.    Duration. This Agreement, effective on the date of its execution, supersedes all prior agreements, verbal or written, between the Company and the Distributor. The duration of this Agreement shall initially be for five (5) years (commencing after the Initial Period has expired) and, subject to the provisions of section 11.2 below, shall be renewed automatically for subsequent five (5) year terms, subject to the right of termination expressed in Sections 11.2 and 11.3 below.

11.2    Normal Termination. If at the end of the initial five (5) year term of this Agreement or any renewal term thereof, Distributor is in default under any provisions of this Agreement, including, without limitation, the purchase order requirements set forth in Exhibit A hereto, Company may, at any time thereafter, terminate this Agreement by giving Distributor thirty (30) days written notice of its intent to do so, subject, however, to Distributor's right to cure such default within thirty (30) days after receipt of such notice of intent. This Agreement shall be automatically renewed pursuant to section 11.1 above for additional five (5) year terms unless Distributor terminates this Agreement upon giving written notice to the Company by registered mail at least 60 days prior to the termination of the then five (5) year term of this Agreement.

11.3    Termination for Cause. The Company shall have the right to terminate this Agreement effective immediately by providing written notice to the Distributor by Registered Mail in any of the following events:

11.3.1 If the Distributor shall make or attempt any assignment of this Agreement or any interest or obligation arising thereunder without the prior written consent of the Company.

11.3.2 If there is any change in the majority ownership, control or operating management of the Distributor, whether voluntary, involuntary or by operation of law.

11.3.3 If the Distributor fails for any reason, to function in the ordinary course of business or fails for a period of ten (10) consecutive days to keep its business operating during the hours customary in the trade in the Territory.

11.3.4 In the event the Distributor becomes insolvent, is adjudged bankrupt, files or has filed against it, any petition under any of the provisions of the Bankruptcy Act of any state or federal law or any law in the Territory equaling the U.S. equivalent of bankruptcy or insolvency, relating to the insolvency, or if a receiver is appointed for its business or property, which insolvency, bankruptcy proceedings or petition is not finally dismissed within

<div align="center">10</div>



(90)days of the filing or commencement thereof, or if the Distributor shall make a ge-
assignment for the benefit of creditors, admit in writing its inability to pay its debts as they
become due, or consent to the appointment of a receiver, trustee, or liquidator of the Distributor
or of all or any substantial part of the Distributor's property.

        11.3.5  Upon a failure by the Distributor to cure any default within thirty
(30) days after having received written notice from the Company of default as to any one or
more of the Distributor's obligations as set forth herein, including, without limitation, payment
on invoices from the Company within five (5) business days of the due date thereof, or the
purchase order requirements set forth in Exhibit A hereto.

        11.4  <u>Rights and Obligations Upon Termination</u>. Immediately upon termination
of this Agreement:

        11.4.1  Distributor  shall  return  to  the  Company  all  Confidential
Information and technology in tangible form, advertising material, sales records, price lists,
catalogs and the like.

        11.4.2  Distributor shall cease to use stationery, or other printed matter,
identifying it as a Distributor of the Company, shall remove signs from the exterior of its
building so identifying it, shall take all necessary steps to change its listing in telephone
directories and shall perform all other actions necessary to remove any identification as a
distributor of the Company.

        11.4.3  Distributor shall provide a detailed list of its customers including
their name, delivery or other street address, telephone number, contact person's name and other
relevant information pertaining to customers to which they sold the Products.

        11.4.4  All orders placed by the Distributor which are not shipped prior to
the date of termination shall be cancelled, Provided, however, that the Company, at its sole
option, may fill the bona fide orders of the Distributor's customers with respect to which the
Company has accepted orders from the Distributor either on or prior to the date of termination.

        11.4.5  In the event of termination pursuant to section 11.3.5 of this
Agreement, the Company shall repurchase, or cause to be purchased from the Distributor, all of
the Distributor's inventory of Product purchased from the Company which, in the sole
determination of the Company, is in first-class, salable condition at 90% of the purchase price
paid by the Distributor, less transportation, handling costs and related expenses. The Company
shall have no obligation to repurchase any Product out of production at the time of the
termination of this Agreement. The Company shall be the final arbiter in determining the
condition and salability of the Product, however, such determination shall not be arbitrary or
capricious, provided, however, that the Company shall, in all instances of termination, have the
right, but not the obligation, to repurchase the Distributor's inventories of the Products, if any, at
the current market price in the Territory.

11.4.6  All sums owing by the Distributor to the Company shall become immediately due and payable.

11.4.7  The Distributor shall have no right to any termination fees or compensation for good will, customers or expenses or any other kind of fees of compensation.

11.5.  Continuing Obligations. No expiration of the original or any extended or renewed term hereof or any other termination of this Agreement shall in any way affect the continuing obligations of Distributor under Article IV, Articles 8 and 9, and Section 11.4, Section 11.6, Article XII and Article XIII hereof.

11.6.  Liability on Termination. The Company shall not be liable to Distributor, as a result of any termination of this Agreement in accordance with the terms hereof, and shall not otherwise have any obligation (statutory or otherwise) to compensate or reimburse Distributor, for any claims or damages whatsoever (including, but not limited to, termination indemnities, lost revenues or profits, Distributor's expenditures, investments, leasehold or employment obligation or other continuing commitments of Distributor). Distributor specifically (i) waives all compensation and damages, whether direct, consequential or otherwise, to which it may otherwise have a right under applicable law in the Territory; (ii) agrees to indemnify and hold the Company harmless from and against all claims of the employees and agents of Distributor for compensation or severance, disability, social security or similar payments; and (iii) agrees not to register as the agent or distributor of the Company in any jurisdiction within the Territory without the prior written consent of the Company.

11.7.  Goodwill. Distributor acknowledges and agrees that any and all goodwill associated with the promotion, distribution and support of the Products in the Territory shall accrue directly to the benefit of the Company and shall be the sole and exclusive property of the Company.

## ARTICLE XII
### INDEMNIFICATION

Distributor shall indemnify and hold the Company and its affiliates harmless from and against any and all claims, liability, costs and expenses (including legal fees) arising out of (i) any misrepresentations by Distributor or its employees in respect of the Products, (ii) any violation by Distributor of any of the provisions of this Agreement or (iii) any negligent, wrongful or intentional acts or omissions on the part of Distributor or its employees.

## ARTICLE XIII
### GENERAL PROVISIONS

13.1  Representations and Warranties.    The parties represent and warrant to each other that: (i) each has all power and authority and legal right to execute, deliver and perform this Agreement and all other agreements to which each of them is a party as a result of this Agreement; (ii) this Agreement, and all other documents, agreements, and instruments

12

executed and delivered in connection herewith by each party to the other has been properly duly executed and validly authorized by all necessary corporate or other proceedings and they constitute the valid, binding and enforceable obligations of each party enforceable against them in accordance with their respective terms, except as enforceability may be affected by bankruptcy, insolvency, reorganization, moratorium or similar remedies relating to or limiting creditor's rights generally and subject to the availability of equitable remedies and (iii) neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby does or will after the giving of notice, or lapse of time or otherwise, conflict with, result in a breach or of constitute a default under a) any contract or agreement, to which either party is a party or b) any federal, state or local law, statute, code, ordinance, rule or regulation, or c) any federal, state or local court or administrative order or process, under which either party may be obligated or by which its assets may be subject or bound.

13.2.   Assignability. Company may assign this Agreement without the consent of Distributor and the Company agrees to assign this Agreement to any person or entity acquiring all or substantially all, of the business and/or assets of the Company in a sale of assets, merger, consolidation, etc. Except for the initial assignment of this Agreement to an entity controlled by Distributor a reasonable time after the execution hereof, Distributor shall not sell, assign, transfer, convey, delegate or encumber its duties and obligations hereunder, or any rights or interests hereunder, and Distributor shall not suffer or permit any voluntary assignment or transfer or encumbrance thereof, by operation of law or otherwise, without the prior written consent of the Company.

13.3.   Notices. All notices, requests, reports, submissions and other communications permitted or required to be given under this Agreement shall be in the English language, and shall be deemed to have been duly given if such notice or communication shall be in writing and sent by personal delivery or by airmail, cable, telegram, telex, facsimile transmission or other commercial means of rapid delivery, postage or costs of transmission and delivery prepaid, to the parties at the addresses set forth at the beginning of this Agreement until such time as either party hereto shall give the other party hereto not less than ten (10) days' prior written notice of a change of address in accordance with the provisions hereof.

13.4.   No Implied Waivers. The failure of either party to exercise any right or option it is granted herein, or to require the performance by the other party hereto of any provision of this Agreement, or the waiver by either party of any breach of this Agreement, shall not prevent a subsequent exercise or enforcement of such provisions or be deemed a waiver of any subsequent breach of the same or any other provision of this Agreement.

13.5.   Modification or Amendment. Except to the extent and in the manner specified in this Agreement, any modification or amendment of any provision of this Agreement must be in writing and bear the signature of the duly authorized representatives of both parties.

13.6.   Language. The language of this Agreement is expressly stipulated to be the English language. In the event that the applicable law of the Territory shall require this

13

Agreement to be governed by such law or shall require any of Products or related documentation to be in a language other than the English language, Distributor shall promptly notify the Company.

13.7. Conformity with Local Laws. The rights and obligations of the parties hereunder are subject to all applicable laws, orders, regulations, directions and restrictions of the various governmental authorities having jurisdiction over the parties. In the event that any of the foregoing shall result in a modification or alteration of this Agreement, either party hereto may request that this Agreement be modified with respect thereto, to the mutual satisfaction of the parties hereto, or either party hereto may, in its sole discretion, terminate this Agreement.

13.8. Arbitration. In the event that the parties are unable to agree on the application or meaning of any of the provisions of this Agreement, the parties agree to submit such dispute or disputes to arbitration under the American Bar Association (the "ABA") Rules of Arbitration then in effect. There shall be one arbitrator, and such arbitrator shall be chosen by mutual agreement of the parties in accordance with ABA rules. The arbitration proceedings shall take place in Chicago, Illinois. The arbitrator shall apply the laws of the State of California, to all issues in dispute, in accordance with 13.8 hereof. The language of all arbitration proceedings hereunder shall be English. The findings of the arbitrator shall be final and binding on the parties; and a judgment upon the arbitrator's award may be entered in any court having jurisdiction thereof. Each party shall bear their own expense of such arbitration unless the arbitrator shall rule otherwise.

13.9. Law Governing Agreement. The validity of this Agreement and the rights, obligations and relations of the parties hereunder shall be construed and determined under and in accordance with the substantive laws of the State of California. If any portion of this Agreement, including exhibits hereto, is held to violate or to be invalid or unenforceable under the laws of any government or subdivision thereof, (i) this Agreement may, at the option of the Company, be terminated immediately upon written notice to Distributor; or (ii) the portion of the Agreement declared to be in violation of or invalid or unenforceable under any such law shall be reasonably construed so as to be valid or enforceable to the extent compatible with the applicable law as it shall then appear, and the remainder of this Agreement shall remain in full force and effect.

13.10. Complete Agreement. This Agreement sets forth the entire agreement between the parties hereto with respect to the subject matter hereof and merges all discussions between them and supersedes and replaces any and every other agreement which may have existed between the Company and Distributor to the extent that any such agreement relates or related to the establishment of an arrangement for the distribution, marketing, sale or support of any Products.

13.11 Force Majeure. Neither party shall be liable or deemed to be in default for any delay or failure in performance under this Agreement or interruption of service resulting, directly or indirectly, from acts of God, civil or military authority, acts of the public enemy, war, riots, civil disturbances, insurrections, accidents, fire, explosions, earthquakes, floods, the elements, unavoidable delays in manufacturing, packing or shipping, strikes, labor disputes,

14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representative as of the day and year first above written.

GZ Gourmet Food and Beverage, Inc., a California C Corporation

By: ______________________
R. Richard Saxby, Its President

______________________
Walter Ascher

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representative as of the day and year first above written.

GZ Gourmet Food and Beverage, Inc., a California C Corporation

By:_____
R. Richard Saxby, Its President

Walter Ascher

17

## EXHIBIT A

## PART ONE

## LIST OF PRODUCTS CURRENTLY AVAILABLE

1. Radioactive Energy Drink (Berry Flavor) Regular
2. Radioactive Energy Drink (Berry Flavor) Sugar Free No Carb

16

## EXHIBIT A

## PART TWO

## TERRITORY

Except as provided below, the Territory shall consist of:

1.    State of Illinois

2.    State of Florida

3.    State of Texas


Exceptions to Territory:

The following listed major retail stores and/or companies shall be excluded from the above definition of Territory:

CVS
Walgreen's
Target
Kroger Markets
Seven Eleven
Circle K
Safeway
Rite Aid
Meier's
Wal-Mart
Caltrains

·17

## EXHIBIT A

## PART THREE

### PRICES

Prices for the regular radioactive drink during the initial ninety (90) days of this Agreement shall be $15.00 (U.S.) per case. Distributor pays for shipping during the initial (90) days of the Agreement.

Prices for the no carb sugar free radioactive drink during the initial ninety (90) days of this Agreement shall be $15.00 (U.S.) per case. Distributor pays for shipping during the initial (90) days of the Agreement.

18

## EXHIBIT A

## PART FOUR

## MINIMUM REQUIRED PURCHASE ORDERS

During the initial six (6) month period of this Agreement after the expiration of the Initial Period, Distributor shall be required to make the following minimum purchases of Product.

| Month | For U.S. Territory |
|-------|--------------------|
| 1 | 1 Containers (1,600 cases) |
| 2 | 1 Container  (1,600 cases) |
| 3 | 1 Containers (1,600 cases) |
| 4 | 3 Containers (4,800 cases) |
| 5 | 5 Containers (8,000 cases) |
| 6 | 5 Containers (8,000 cases) |

Following the initial 6 month period of this Agreement, the Parties shall evaluate the Product requirements for the Territory and may revise the minimum monthly purchase orders; provided, however, that such minimum monthly purchase orders shall not be less than 5 containers (8,000 cases) per month.

19